UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

BOARD OF COMMISSIONERS OF
CLERMONT COUNTY, OHIO

      Plaintiff,

  v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,

      Defendants.

Case No. 1:17-cv-389
JUDGE DOUGLAS R. COLE

## OPINION AND ORDER

This action under the Freedom of Information Act ("FOIA") comes before the Court on Defendant United States Environmental Protection Agency's ("EPA") Motion for Summary Judgment ("Motion") (Doc. 15). In the FOIA request underlying this action, Plaintiff Board of Commissioners of Clermont County ("Clermont County") sought EPA documents relating to the CECOS International, Inc., facility at 5092 Aber Road, Williamsburg, Ohio 45176 (which is located in Clermont County) (the "CECOS Site"). In the Motion, EPA claims that all of the remaining unproduced documents relating to the FOIA request are protected from disclosure under Exemption 5 to FOIA, which protects "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). The Supreme Court has construed this language as exempting any documents that would be privileged in the civil litigation context. *See NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975). Here, EPA

claims that the undisputed facts show the requested documents are subject either to the deliberative-process privilege, the attorney-client privilege, or both. For the reasons set forth below, the Court **GRANTS** the Motion.

## BACKGROUND

Clermont County sent its FOIA request to EPA in the form of a letter dated March 18, 2016. In the letter, Clermont County sought "[a]ny and all information pertaining to the [CECOS Site] for the time period of February 1, 2015 through [March 18, 2016]." (Doc. 1-1, Compl. Ex. 1, #8[1]). The CECOS Site is a now-closed hazardous waste disposal facility. Clermont County explains it sought the documents because Harsha Lake is located downstream from the site and serves as a principal source of drinking water for 90,000 citizens as well as an important recreation and economic resource to the County. (Plaintiff's Opposition to Summ. J. ("Pl.'s Opp."), Doc. 18, #257). Clermont County claims it is concerned that contamination may leak from the CECOS Site into Harsha Lake, and that the requested documents would help it investigate those concerns.

In response to the request, EPA produced approximately 2,900 pages of documents, but withheld sixty documents, citing FOIA Exemption 5 and, in particular, the deliberative-process and attorney-client privileges. (Doc. 15, #151). As to the sixty withheld documents, EPA provided a list in which it separately described each document (title, author, recipients, date, and number of pages), as well as the basis on which EPA was withholding that document.

---

[1] Refers to PageID#.

Clermont County filed an administrative appeal challenging EPA's withheld documents. The ALJ granted-in-part and denied-in-part that appeal. As a result, EPA released-in-full three of the sixty withheld documents, released-in-part six other withheld documents, and found that eleven documents were not responsive to the request. That left forty documents withheld-in-full, and six withheld-in-part.

Clermont County then brought suit as to these remaining documents. But, since the time of filing suit, the parties have reached further accommodations as to some of the documents. In particular, Clermont County informed the EPA that Clermont County would no longer challenge EPA's withholding of seventeen of the documents (including the eleven that EPA claims are not responsive). As to four other documents that EPA had withheld-in-full, it is now releasing the documents in their entirety. And there are three other documents that EPA withheld-in-full that it will now release-in-part. As a result of these additional events, EPA is now withholding twenty-two unique records in full, and eleven unique records in part.[2]

As to these remaining documents, EPA has now filed for summary judgment, asserting that the undisputed facts show that FOIA Exemption 5 applies to the documents as a matter of law. It supports its motion with an affidavit from Mary Setnicar, who is the Chief of the Resource Conservation and Recovery Act/Toxic Substances Control Act Programs Section, Land and Chemicals Division, in EPA

---

[2] In Clermont County's opposition, Plaintiff asserts that thirty-six documents are at issue. (Pl.'s Opp., #258). The difference between the two counts appears to arise from EPA counting based on "unique records," while Clermont County counts documents, as some of the documents or records on the list appear to be duplicates. In any event, as further described above, based on the *Vaughn* index, the parties appear to be in agreement on the documents at issue here, even if not in agreement as to how to count them.

Region 5. In addition to explaining why each of the documents falls within FOIA Exemption 5, she attaches to her affidavit what is typically referred to as a *Vaughn* index. This index lists each withheld document, and, as to each, identifies the document's subject or title, author/sender, recipients, date, claimed exemption, and a description of the document's content and the rationale for withholding.

The asserted rationales fall into two camps. As to some documents, EPA relies exclusively on the deliberative-process privilege. As to the rest of the withheld documents, EPA asserts both the deliberative-process privilege and the attorney-client privilege.

Because the remaining universe of documents described in the *Vaughn* index is relatively small, the Court ordered EPA to provide those documents for in camera review, which EPA did. The Court has thus had an opportunity to review the documents in connection with considering EPA's arguments, as well as Clermont County's objections to those arguments.

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to conclusively show that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). Once the movant presents evidence to meet its burden, the nonmoving party may not rest on

4

its pleadings, but must come forward with significant probative evidence to support its claim. *Celotex*, 477 U.S. at 324; *Lansing Dairy*, 39 F.3d at 1347.

This Court is not obliged to sua sponte search the record for genuine issues of material fact. *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996); *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 404–06 (6th Cir. 1992). Rather, the burden falls upon the nonmoving party to "designate specific facts or evidence in dispute." *Jordan v. Kohl's Dep't Stores, Inc.*, 490 F. App'x 738, 741 (6th Cir. 2012) (quotation omitted). If the nonmoving party fails to make the necessary showing for an element upon which it bears the burden of proof, then the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

Granting summary judgment depends upon "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Amway Distribs. Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)). In sum, the nonmoving party, at this stage, must present some "sufficient disagreement" that would necessitate submission to a jury. *See Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251–52). In making that determination, though, this Court must view the evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) ("In arriving at a resolution, the

court must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party.").

## LAW AND ANALYSIS

"[W]hen Congress enacted FOIA, it sought a workable balance between disclosure and other governmental interests …." *Food Marketing Inst. v. Argus Leader Media*, ___ U.S. ___, 139 S. Ct. 2356, 2366 (2019) (quotation omitted); *see also Ctr. For Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 925 (D.C. Cir. 2003) ("FOIA represents a balance struck by Congress between the public's right to know and the government's legitimate interest in keeping certain information confidential.") (citing *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989)).

The balance "generally favor[s] disclosure, subject only to a handful of specified exemptions." *Milner v. Dep't of Navy*, 562 U.S. 562, 571 n.5 (2011). Consistent with that, under FOIA "an agency must disclose all records requested by any person, unless the information sought falls within one of the nine numerated exemptions listed in section 552(b)." *Vaughn v. United States*, 936 F.2d 862, 865 (6th Cir. 1991). And, given the "Act's goal of broad disclosure," the exemptions are to "be given a narrow compass." *Milner*, 493 U.S. at 152 (quoting *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 151 (1989)); *see also Rugiero v. U.S. Dep't of Justice*, 257 F.3d 534, 543 (6th Cir. 2001) ("These exceptions are to be narrowly construed."). Moreover, "the burden is on the agency to justify its action." *Rugiero*, 257 F.3d at 543.

Courts typically resolve FOIA cases on summary judgment. That is true notwithstanding that it "creates a situation in which a plaintiff must argue that the

agency's withholdings exceed the scope of the statute, although only the agency is in a position to know whether it has complied with the FOIA," as the plaintiff of course has not seen the documents. *Rimmer v. Holder*, 700 F.3d 246, 255 (6th Cir. 2012) (quoting *Rugiero*, 257 F.3d at 544).

Here, EPA is relying solely on one of the nine enumerated exemptions—Exemption 5. This provision exempts from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party … in litigation with the agency." 5 U.S.C. § 552(b)(5). In other words, it exempts documents that fall within one of the recognized privileges that typically apply to civil litigation. Thus, if a document falls within a litigation privilege, it is also exempt from production under FOIA. EPA relies on two such privileges here: the deliberative-process privilege and the attorney-client privilege. The Court addresses each in turn.

### A. EPA Has Shown That The Deliberative-Process Privilege Applies To The Documents For Which It Is Claimed.

The Supreme Court has explained that "[t]he deliberative process privilege rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance the quality of agency decisions, by protecting open and frank discussion among those who make them within the Government." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8–9 (2001) (quotations omitted). To that end, the deliberative-process privilege "aims to protect documents that are both 'predecisional' and 'deliberative.'" *U.S. ex rel. Williams v. Renal Care Grp., Inc.*, 696 F.3d 518, 527 (6th Cir. 2012) (quoting *Norwood v. FAA*, 993 F.2d 570, 576 (6th

7

Cir.1993)). "A document is predecisional when it is received by the decisionmaker on the subject of the decision prior to the time the decision is made, and deliberative when it reflects the give-and-take of the consultative process." *Renal Care Grp.*, 696 F.3d at 527 (quoting *Norwood*, 993 F.2d at 576).

"Although this privilege covers recommendations, draft documents, proposals, suggestions, and other subjective documents that reflect the opinions of the writer rather than the policy of an agency, the key issue in applying this exception is whether disclosure of the materials would 'expose an agency's decisionmaking process in such a way as to discourage discussion within the agency and thereby undermine the agency's ability to perform its functions.'" *Rugiero*, 257 F.3d at 550 (quoting *Schell v. U.S. Dep't of Health and Human Servs.*, 843 F.2d 933, 940 (6th Cir. 1988) (in turn quoting *Dudman Commc'ns Corp. v. Dep't of the Air Force*, 815 F.2d 1565, 1568 (D.C. Cir. 1987))). Accordingly, "[p]urely factual and investigative matters that are severable without compromising the confidentiality of other documents do not enjoy the privilege." *Renal Care Grp.*, 696 F.3d at 527.

Here, EPA asserts the deliberative-process privilege as to thirty-six records which, EPA claims, fall into three general categories: draft PowerPoint presentations about the site; (2) EPA staff-level geologist notes and opinions; and (3) internal emails among EPA staff. For its part, Clermont County does not appear to contest that the documents at issue are "predecisional." Rather, Clermont County focuses its efforts on identifying facts that show that the documents are not "deliberative," that is, that

8

the documents do not reflect the "give and take of the consultative process," but rather involve "factual and investigative matters."

A difficulty for the Court in addressing EPA's arguments is that EPA's category identifiers do not correspond to the contours of the FOIA exemption on which EPA relies. For example, many types of documents could fall into the descriptive category "emails among EPA staff," some of which undoubtedly would be exempt from disclosure under the deliberative-process privilege, and some of which clearly would not. The same is largely true of the other two categories of documents that EPA asserts. To be sure, "draft" documents (i.e., the category "draft PowerPoint presentations") are more likely to be predecisional, but that element is not disputed. And, as to whether a document is deliberative, it seems to the Court that either draft or final PowerPoint presentations could satisfy (or could not satisfy) that element. That is, either a "draft" presentation or a "final" presentation could be used as part of an agency's internal deliberative process.

Luckily, though, while the documents are grouped in this manner for briefing purposes, the *Vaughn* index is far more detailed on a document-by-document basis. In other words, EPA is not relying on a document's mere status as a "PowerPoint presentation" to substantiate the claimed exemption, but rather on EPA's description of the particular document itself. And, as also noted, at Clermont County's request, the Court ordered EPA to produce the documents for in camera review, which the Court has undertaken on a document-by-document basis.

9

But even with that review, the case presents a difficult line-drawing exercise. The Court must attempt to distinguish between "deliberative documents," which are exempt from production, and "purely factual or technical" documents, which are not. The problem with that proposed dichotomy, though, is that in many areas, "factual or technical documents" may reflect a government scientist's or policymaker's preliminary view on the "facts," rather than a neutral presentation and assessment of agreed facts. Still, the Court will do its best to draw the required line as to each of the documents within the three identified categories.

### 1. The PowerPoint Presentations.

The Court starts with the referenced PowerPoint presentations, which reflect the difficulty with the deliberative/factual divide. For example, many of the slides in the presentations appear to consist of maps, which are largely factual, but the maps are then coupled with an EPA geologist's assessment of additional geological features that he or she believes may be present. The fact that these slides are being presented to others within the agency as "drafts" would suggest that the author may be seeking deliberative input as to whether his or her initial conclusions, as referenced on the drawings, are accurate, or should be revised. These seem to be exactly the type of "frank discussions" that the deliberative-process privilege is designed to protect.

To be a little more granular in the analysis, the slides fall into three separate presentations. The first is a five-slide group that is directed at the paleotopography of the site. The second is a 582-slide presentation regarding technical and regulatory

10

review for closure and post-closure approval. And the third is a thirty-six-slide presentation, once again directed at closure and post-closure analysis of the site.

As to the paleotopography presentation, it begins with a diagram of the site, coupled with a geologist's opinions regarding likely geographic features. That is then supplemented with draft findings and opinions about "potential problems." All of that falls, at least in large part, on the deliberative side of the deliberative/factual divide. Identifying "potential problems" with a site is a subjective, opinion-based endeavor, and coming to internal agency consensus about what does—or does not—constitute a "problem" strikes the Court as very much part of the deliberative process.

The 582-slide presentation, not surprisingly, covers a host of issues. Many of the slides are maps (factual) with notes containing agency geologists' initial impressions (deliberative). Other slides reflect preliminary views on conclusions that could be drawn from the information depicted on the maps. Yet further aspects of the PowerPoint presentation seem to reflect the geologist author's view on what are apt points of comparison between the CECOS site, on the one hand, and geological formations at other sites, on the other. As to that, while the information that the PowerPoint presents regarding the *other* sites is likely not privileged or confidential in and of itself, the geologist's decisionmaking process in selecting *which* sites to include, and *why*, would likely reflect his or her deliberative process. Moreover, whether these other sites represent apt comparisons is also a likely deliberative topic of conversation among those who internally review the draft PowerPoint at EPA.

Still other aspects of the presentation highlight which attributes, in this one geologist's view, create "potential problems." That again strikes the Court as "opinion," more than "fact," and once again as an opinion that is subject to review and "frank discussion" with others at EPA as part of the deliberative process.

That also raises an additional issue that supports applying the deliberative-process privilege. In particular, courts have noted that the privilege not only protects an agency's ability to have frank internal discussions as part of an internal give and taken, but is also designed "to minimize public confusion about agency rationales and actions." *Broward Bulldog, Inc. v. U.S. Dep't of Justice*, 939 F.3d 1164, 1194 (11th Cir. 2019). This includes the confusion that would arise "from premature disclosure of ideas that are not—or not yet—final policy." *Judicial Watch, Inc. v. U.S. Dep't of Def.*, 847 F.3d 735, 739 (D.C. Cir. 2017). Here, much of the material on the PowerPoint slides, which themselves were marked "Draft for Discussion Purposes Only," strike the Court as information that may well have been changed or updated based on internal agency discussions. Thus, releasing the draft document, at least to the extent that it might reflect differences from the same document's final form, potentially would create confusion over the Agency's actual position on various issues.

Moreover, although this document is admittedly long (582 slides), the Court finds that one or more of the issues raised above arise on all or virtually all of those slides. That is, the Court finds that there is no meaningful subset of pages that EPA could produce from the overall document. Nor would redactions be effective. To the extent that notes or observations are coupled with purely factual matters, they tend

12

to be presented in an intertwined fashion that would make redaction difficult or impossible.

Finally, as to the thirty-six-slide presentation, the Court agrees that the EPA aptly described that document in the *Vaughn* index. Based on the Court's review of that document, the Court concludes that, for many of the same reasons that applied to the 582-slide presentation, this document falls within the deliberative-process privilege. Again, it appears to reflect one geologist's analyses, assumptions, and assessments, which are being presented for review and consideration by others at EPA.

In short, the Court agrees with EPA that the draft PowerPoint presentations included in the *Vaughn* index—which collectively encompass 623 of the roughly 800 pages of documents provided for the Court's review—fall within the deliberative-process privilege. Moreover, based on the Court's review, it appears that the protected material is so interwoven with the document as a whole that redaction would be impossible. Thus, the Court agrees that EPA is entitled to withhold the entirety of these documents.

### 2. EPA Staff-Level Geologist Notes, Opinions, and Memoranda.

The "notes and opinions" category consists of roughly thirteen documents, comprising a total of 131 pages, consisting of notes and draft memoranda. Based on the Court's review of the documents, the Court concludes that they are accurately described in the *Vaughn* index. As that index suggests, some of these documents consist of handwritten or typed notes or memoranda regarding a geologist's

13

impressions or opinions regarding aspects of the CECOS site. These materials appear designed to contribute to an "open and frank discussion among" EPA regulators about closure processes for the site. *See Klamath Water Users Protective Ass'n*, 532 U.S. at 9. Other documents (*see, e.g.*, Doc. ID 20160921144941941) consist of publicly available materials, but marked up with handwritten notes from an EPA geologist. EPA has indicated where the publicly available materials may be obtained, meaning all that is left is the handwritten notes, which the Court concludes, based on its review, are predecisional and deliberative. In other circumstances (*see* Doc. ID 0017_Bloomington_IN_PCP_Sites; 022_cecos monitoring 2007-2008 part annot), EPA is releasing the publicly available portion and redacting the geologist's notes. The Court agrees that is a permissible approach, and that the redacted materials fall withing the deliberative privilege.

In sum, the Court concludes that the materials included in the category notes and opinions are predecisional and deliberative, and accordingly fall within Exemption 5.

### 3. Internal Emails Among EPA Staff.

That leaves the category of internal emails. EPA claims that some of the emails on the *Vaughn* index are covered, in whole or in part, by the deliberative-process privilege. The Court has reviewed each of the identified emails, and compared it to the corresponding description for that email in the *Vaughn* index. The descriptions accurately reflect the email contents. And the Court agrees with EPA that these contents are both predecisional and deliberative. Indeed, perhaps unsurprisingly, as

14

they are email exchanges among EPA personnel involved in making regulatory decisions relating to the CECOS site, they expressly reflect the kind of frank discussions and exchanges among regulators that are often essential to agencies' internal deliberative processes. Disclosing these documents would almost certainly "expose an agency's decisionmaking process in such a way as to discourage discussion within the agency and thereby undermine the agency's ability to perform its functions." *Rugiero*, 257 F.3d at 550 (quotation omitted).

**B.     The Attorney-Client Privilege Applies To The Documents Or Portions Of Documents As To Which It Is Invoked.**

In addition to the deliberative-process privilege, FOIA Exemption 5 also includes the attorney-client privilege. As one court of appeals recently explained, the "attorney-client privilege protects confidential communications between client and counsel made for the purpose of obtaining or providing legal assistance. The privilege functions to encourage attorneys and their clients to communicate fully and frankly and thereby to promote broader public interests in the observance of law and administration of justice." *Am. Civil Liberties Union v. Nat'l Sec. Agency*, 925 F.3d 576, 589 (2d Cir. 2019) (quotation omitted). As that language suggests, the privilege does not apply merely because an attorney is included in a communication. Rather, the question is whether the communication is confidential and aimed at seeking or conveying legal advice. EPA has invoked that exemption with regard to a few of the documents on its *Vaughn* index.

Having reviewed those materials, the Court concludes that EPA appropriately invoked the privilege. In each instance in which EPA asserted the privilege, the

15

materials were either seeking, providing, or conveying legal advice that an EPA attorney provided in connection with the CECOS site review. To be sure, one of the documents as to which the privilege is invoked is an email between two non-lawyer EPA employees (cc'd to an attorney), but the contents of that communication include a portion that conveys legal advice that one of the two employees had received from the copied EPA attorney. (As noted above, the email was also covered by the deliberative-process privilege, so the non-attorney-client-privileged portions are also exempt from disclosure.)

In short, based on the Court's review of the materials, EPA has carried its burden of demonstrating that the materials are exempt from disclosure under FOIA Exemption 5 on the bases asserted by EPA, whether deliberative-process privilege, or attorney-client privilege, or both.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** EPA's Motion for Summary Judgment (Doc. 15). The Court **DIRECTS** the Clerk to enter judgment accordingly.

**SO ORDERED.**

February 4, 2021
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**